### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| JENNIFER HITCHCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CAUSE NO. 1:11-CV-276** |
| v. | ) | |
| | ) | |
| ANGEL CORPS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

### I.  INTRODUCTION

The present summary judgment motion (Docket # 17) asks whether Plaintiff Jennifer Hitchcock has presented sufficient evidence from which a reasonable jury could infer that her former employer, Defendant Angel Corps, Inc., a home care agency with an overwhelmingly female workforce, fired her because she was pregnant and *not* because she admitted a client for services who was already dead.

While Angel Corps stands by its stated reason for terminating Hitchcock in its motion—that she completed a full admission on an expired client—Hitchcock maintains that this is a lie and that Angel Corps actually fired her because she was pregnant in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act ("PDA").[1] Ultimately, however, as explained in this opinion, Angel Corps's Motion for Summary Judgment will be GRANTED.

---

[1] Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (*See* Docket # 7.)

1

## II.   FACTUAL AND PROCEDURAL BACKGROUND[2]

Angel Corps is a non-medical home care agency that performs personal care services for its clients.  (Norman Aff. ¶ 3; Hitchcock Dep. 28-29.)  It is affiliated and shares office space with Home Nursing Services, a medical home care agency (Yonkman Aff. ¶ 3; Hitchcock Dep. 28); both of these companies are owned by Richard and Dorian Maples (D. Maples Aff. ¶ 2; R. Maples Aff. ¶ 2).  Angel Corps and its affiliated companies employ over 250 female employees and less than 10 male employees.  (R. Maples Aff. ¶ 3.)  On October 6, 2008, Angel Corps hired Jennifer Hitchcock as its Client Services Supervisor.  (Hitchcock Dep. 29, 31.)

In this role, Hitchcock was responsible for performing new client admissions, assessing the client's needs and environment when first arriving at the residence to determine appropriate services, preparing an assignment sheet that incorporates the client's needs with services to be provided, reporting client concerns to the Client Services Director, and documenting fully and accurately to record a complete total picture of the client's status.  (Hitchcock Dep. 35-36, Ex. H; Hitchcock Aff. ¶ 4; Norman Dep. 12.)  Hitchcock further understood that one of her primary responsibilities was the Client Assessment, which was meant to ensure an accurate reflection of client needs.  (Hitchcock Dep. 36-37, Ex. I.)

While Hitchcock is a licensed practical nurse ("LPN") (Hitchcock Dep. 3), being a LPN was not a requirement for the client services supervisor position, though it did require previous supervisory experience in a health care setting.  (Hitchcock Dep. 29, Ex. H.)  In fact, Hitchcock

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Hitchcock, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Angel Corps also filed Motions to Strike Portions of Affidavits of Jennifer Hitchcock and Johanna Barrera (Docket # 31) and Hitchcock's Supplemental Affidavit (Docket # 34).  But even when considering the evidence that Angel Corps seeks to strike, Hitchcock's claim still fails as a matter of law, and summary judgment is therefore appropriate.  As such, the Court will consider the evidence that Angel Corps seeks to strike and deem its two motions to strike (Docket # 31, 34) MOOT.

states that when Angel Corps hired her, she was told to "leave [her] nursing hat at home" and that Angel Corps was not employing her as a nurse. (Hitchcock Dep. 81.) However, according to Robin Norman, Angel Corps's Client Services Director and Hitchcock's immediate supervisor, Angel Corps employees are instructed and expected *not* to check their common sense or medical knowledge at the door and that, as such, a client services supervisor who observes a medical issue with a client should either attempt to address the problem or inform someone at Angel Corps so that assistance can be provided. (Norman Aff. ¶¶ 2-3; Norman Dep. 5, 39.)

Regarding the employee's personal safety, Angel Corps provides its employees with cell phones to call 911 and maintains a security system. (Norman Dep. 12.) Furthermore, as part of her employee orientation at Angel Corps, Hitchcock was shown a safety video that instructed her to leave if she felt in danger during a home visit. (Norman Dep. 10.)

### A.  Hitchcock's Pregnancy

At the end of January 2010, Hitchcock learned that she was pregnant. (Hitchcock Dep. 84.) By late February or early March, she had told a few people in her office about her pregnancy (Hitchcock Dep. 84; Hitchcock Aff. ¶ 9), but never directly told Norman (Hitchcock Dep. 105.) Hitchcock estimates that, within a week of her telling the first Angel Corps employee about her pregnancy, word got back to Norman. (Hitchcock Dep. 106.) From this time until a meeting with Norman on March 25, 2010, Hitchcock felt that Norman ignored any conversation regarding her pregnancy. (Hitchcock Dep. 99.)

During this March 25, 2010, meeting, Hitchcock maintains that Norman told her she had been reluctant to discuss Hitchcock's pregnancy because everyone needed to stay focused on work and asked her whether she was going to continue her employment at Angel Corps after she

gave birth.[3]  (Hitchcock Dep. 99-100.)  Hitchcock was only twelve weeks along at this point and responded that she did not know yet, but would give plenty of notice if she decided not to return. (Hitchcock Dep. 99-100.)  From that day forward, Hitchcock believes that Norman treated her differently by greeting everyone in the morning but her, not wanting to have any pleasant non-work-related conversations, leaving her out of personal conversations with other employees, and treating her with contempt on a "day-to-day basis."  (Hitchcock Dep. 100-01; Hitchcock Aff. ¶ 15.)

After this meeting, Norman never openly discussed Hitchcock's pregnancy with her again and would interrupt and redirect any conversations she heard about it.  (Hitchcock Aff. ¶ 15.)  Norman also started requesting a weekly meeting with Hitchcock to "scrutinize" her progress for the week, something that had never been done before, and gave her extra work to do, such as completing monthly reports, performing marketing responsibilities, assembling new admission packets, and handling all client complaints and concerns, which had previously been directed to Norman.  (Hitchcock Dep. 101-02; Hitchcock Suppl. Aff. ¶ 6.)  According to her job description, one of Hitchcock's "essential job functions" as the Client Services Supervisor was "other duties as assigned by [the] Client Services Director."  (Hitchcock Dep. Ex. H.)  Despite this extra work, Hitchcock was not asked to work extra hours (Hitchcock Dep. 103); it was expected that she complete all responsibilities within her forty hour work week (Hitchcock Suppl. Aff. ¶ 6).  Hitchcock had a child in daycare that she had to pick up by 5:30 every day, which Hitchcock had told Norman when she was hired, making her unavailable to work after

---

[3] Norman, however, does not recall any such discussion.  (Norman Dep. 46.)  But, for the purposes of summary judgment, the Court assumes that such a conversation took place.

4

hours.  (Hitchcock Suppl. Aff. ¶ 5.)

Besides Norman's purported reaction to her pregnancy, Hitchcock also contends that at least three other employees at either Angel Corps or Home Nursing Services—Latonya Woosley, Teresa Greer, and Jeri Westmoreland, all non-decisionmakers—warned her that "[her] days [at Angel Corps] were probably numbered," that Woolsey, an Angel Corps employee, further told her that "they" were probably going to get rid of her, and that Westmoreland, a Home Nursing Services employee, also told her on more than one occasion that her job was in jeopardy.[4] (Hitchcock Dep. 103; Hitchcock Aff. ¶ 27; *see* Westmoreland Aff. ¶ 2 (where Westmoreland states she was the Human Resources Manager for Home Nursing Services); Hitchcock Aff. ¶ 40 (where Hitchcock indicates that Teresa Greer was a former Home Nursing Services employee).)

Hitchcock contends that another Angel Corps employee, Johanna Barrera, was also terminated while pregnant; admittedly, however, Hitchcock does not know *why* Barrera was terminated.  (Hitchcock Dep. 86.)  According to Barrera, in the early spring of 2009, when she was working as an administrative assistant at Angel Corps, she became pregnant and subsequently had a conversation with Norman about her pregnancy.  (Barrera Aff. ¶¶ 2, 5-6.) The parties dispute the content of this conversation; Barrera contends that Norman told her she should have an abortion (Barrera Aff. ¶ 6), while Norman maintains that Barrera came into her office one day very upset about her pregnancy and that they discussed many options, including abortion, but that Norman never made a comment regarding this option (Norman Aff. ¶ 22). Barrera subsequently had a miscarriage, but remained employed at Angel Corps during and after

---

[4] In sworn affidavits, Woosley and Westmoreland deny making such statements.  (Woosley Aff. ¶ 10; Westmoreland Aff. ¶ 10.)  There is no affidavit from Greer.

her pregnancy. (Barrera Aff. ¶ 8; Norman Aff. ¶ 23.)  Barrera became pregnant again in the fall of 2009. (Barrera Aff. ¶ 9.)  On December 14, 2009, Angel Corps terminated Barrera, who was still pregnant, after she took a week off work, claiming to be sick, when, as Angel Corps discovered, she was actually in North Carolina interviewing for another job. (Norman Aff. ¶ 24; Barrera Aff. ¶ 9.)

Hitchcock concedes that at least one woman at Angel Corps—the Maples's daughter-in-law—continued to work there while pregnant. (Hitchcock Dep. 86.)  Angel Corps further provided the names of seven women, out of a list of seventeen, at Angel Corps and its related companies, First Call and Home Nursing Services, who became pregnant and returned to work without being terminated. (Norman Aff. ¶ 25, Ex. 3.)  Hitchcock maintains that there is a difference between Angel Corps office staff and its field staff regarding the amount of interactions each would have with management, including Norman; office staff worked in direct contact with Norman on a daily basis, but field staff apparently did not. (Hitchcock Aff. in Resp. to Ex. 3 to Norman Aff. ¶¶ 3-4.)  According to Hitchcock, only two of these seventeen employees—Barrera and the Maples's daughter-in-law—were Angel Corps office staff employees. (Hitchcock Aff. in Resp. to Ex. 3 to Norman Aff. ¶ 6.)

### B. The Admission of Ruth Rees

On March 29, 2010, Norman received a referral for Ruth Rees, which she gave to Hitchcock to schedule a new client admission. (Norman Aff. ¶ 4.)  The referral was from Ruth's former daughter-in-law and indicated that Ruth was over 100 years old and hearing and vision impaired. (Hitchcock Aff. ¶ 15, Ex. J.)  Hitchcock spoke with John Rees, Ruth's son and caregiver, and scheduled the admission for March 31, 2010; Hitchcock called in sick that day

6

and rescheduled the admission for April 5, 2010.  (Hitchcock Aff. ¶¶ 15, 17-18; Hitchcock Dep. 39; Norman Aff. ¶ 5.)  Before the admission, Hitchcock started Ruth's paperwork at the office using the referral form as a guide.  (Hitchcock Aff. ¶ 16.)

On April 5, 2010, at approximately 1 o'clock p.m., Hitchcock went to Ruth's home, which she shared with her son.  (Hitchcock Dep. 39-40, 42-43.)  Mr. Rees let her into the home, and Hitchcock began going through the admission paperwork with him.  (Hitchcock Aff. ¶ 19; Hitchcock Dep. Ex. Q.)  Mr. Rees reported that his mother was sleeping in the bedroom.  (Hitchcock Dep. Ex. Q.)  Before talking to, observing, or even laying eyes on Ruth, Hitchcock completed Ruth's Assignment Sheet, noting, from only Mr. Rees's report, that Ruth could get up as tolerated; had speech, vision, and hearing deficits; had allergies; had a regular diet; had dentures; and needed assistance with feeding.  (Hitchcock Dep. 44-48.)  Mr. Rees informed Hitchcock that Ruth had stopping eating three days before and was also refusing liquids.  (Hitchcock Dep. Def.'s Ex. Q.)  Hitchcock discussed hospice and end of life care with Mr. Rees.  (Hitchcock Aff. ¶ 20; Hitchcock Dep. Ex. Q.)  From their conversation, Hitchcock surmised that Mr. Rees had an aversion to the medical field.  (Hitchcock Aff. ¶ 19.)

Although Hitchcock completed this assessment of Ruth without ever actually speaking to her, being in the same room with her, or conducting any sort of "hands on" assessment (Hitchcock Dep. 45, 47, 49, 51-52), Hitchcock maintains that physical assessments were never performed when doing an admission on a new client (Hitchcock Aff. ¶ 6), and that**,** over the course of her employment and pursuant to Norman's training and permission, she performed several admissions without the client present, consulting only the caregivers or family members of the new client (Hitchcock Aff. ¶ 8; Suppl. Aff. ¶ 3).  And, according to Hitchcock and

Barrera, no Angel Corps employee was allowed to perform any skilled nursing procedure on a

client, including eye tests and dressing changes.  (Hitchcock Aff. ¶ 5; Barrera ¶ 12.)

   Only after completing the admissions paperwork did Hitchcock ask to see Ruth.

(Hitchcock Dep. Ex. Q.)  Mr. Rees led her to the bedroom, informing her that Ruth had a skin

tear on her lower leg that he was dressing himself.  (Hitchcock Dep. Ex. Q.)  From the doorway,

Hitchcock observed Ruth for less than two minutes.  (Hitchcock Dep. 60, Ex. Q.)  She was

laying on her left side on the bed, which was approximately three feet from the doorway, with

her back facing the door.  (Hitchcock Dep. 60, Ex. Q.)  She was covered with a sheet, and the

only area of her body that Hitchcock could see was the back of her head.  (Hitchcock Dep. Ex.

Q.)  Hitchcock never performed a physical assessment of Ruth or attempted to enter the room

because she felt that Mr. Rees was blocking her entry.  (Hitchcock Dep. 61.)  At the same time,

she never asked him to move so that she could go into the room.  (Hitchcock Dep. 62.)  Mr. Rees

lifted the sheet off of Ruth's legs, allowing Hitchcock to see that there was blood coming

through the dressings.  (Hitchcock Dep. 62-63.)  When Mr. Rees lifted Ruth's leg off the bed,

her shoulder shifted slightly, and Hitchcock interpreted this as Ruth taking a breath.  (Hitchcock

Dep. Ex Q; Hitchcock Aff. ¶ 21.)  Hitchcock also observed that there was brown liquid on the

sheet, which appeared to be dried blood, that had pooled out of Ruth's mouth; Mr. Rees told her

that it was Ensure that he had tried to give his mother that morning.  (Hitchcock Dep. 62, Ex. Q.)

   After observing Ruth for less than two minutes, Hitchcock had an uneasy feeling about

her condition—that she was either dying or had passed—and about Mr. Rees's mental status.

(Hitchcock Dep. Ex. Q.)  Hitchcock, attempting to stay calm and not show concern out of fear

for her own safety, then told Mr. Rees that a caregiver would be sent tomorrow, left the home,

and drove back to her office—a ten-to-fifteen minute drive. (Hitchcock Dep. 63-64; Hitchcock Aff. ¶ 23.) She did not change any of the documentation once she left the house. (Hitchcock Dep. 63-64.) Hitchcock indicated on a home safety evaluation form that the "[e]nvironment [was] safe for the provision of care" (Hitchcock Dep. 57, Ex. O at 3), but later testified that she felt very threatened and scared during this visit (Hitchcock Dep. 63).

Once Hitchcock completed the admission and returned to Angel Corps, she met with Norman[5] (Hitchcock Dep. 63) and reported her concerns about Ruth's condition—namely, that she may be actively dying (Norman Dep. 24). They further discussed the wound on Ruth's lower leg and the drainage from her mouth. (Norman Dep. 25-26.) As the conversation progressed, Norman first felt that someone had to be sent out to the home that day rather than the next and then became so concerned she decided to call Adult Protective Services ("APS"). (Norman Aff. ¶¶ 8-9.) Norman first left a message with APS, and when APS called back 30 minutes later, she expressed the concerns regarding Ruth. (Norman Aff. ¶ 10; Norman Dep. 29-30.) APS directed Norman to call 911, and Norman called the Desk Sergeant; after some initial confusion over the services that Angel Corps provided to Ruth, an ambulance was dispatched to the home. (Norman Dep. 31; Norman Aff. ¶¶ 15-16.) Norman and Hitchcock then went to speak to Woolsey about who—Norman or Woolsey, or both—should go to Ruth's home that day. (Norman Aff. ¶ 11; Woolsey Aff. ¶ 6.) Norman was later informed that Ruth was deceased and had been for two or three days. (Norman Aff. ¶ 16.) Hitchcock contends that, after Norman knew Ruth was deceased, she instructed Hitchcock to enter the admission papers into the

---

[5] Angel Corps contends that the first person Hitchcock met with upon returning to the office was Woolsey, the scheduler, and that they spoke about arranging staff to go out to Ruth's home the next day. (Norman Aff. ¶ 5.) Such a dispute, however, does not preclude summary judgment.

computer, which, according to Hitchcock, completed the admission.[6]  (Hitchcock Dep. 81.)

On April 16, 2010, Norman and Hitchcock met with Dorian Maples, one of Angel Corps's owners, to discuss the Rees incident.  (Norman Aff. ¶ 10; Norman Dep. 35; D. Maples Aff. ¶ 3.)  Angel Corps decided to suspend all of Hitchcock's client visits and admissions until a complete investigation could take place.  (Norman Aff. ¶ 18; D. Maples Aff. ¶ 4; Hitchcock Dep. 77-78, Ex. R.)  Hitchcock was instructed to continue to report to the office at her regular hours.  (Norman Aff. ¶ 18; Hitchcock Dep. Ex. R; Hitchcock Aff. ¶ 31.)  Angel Corps did not terminate Hitchcock on the spot because it wanted to determine whether any extenuating circumstances existed.  (R. Maples Aff. ¶ 8.)  As a result of the investigation, which included attempting to obtain a coroner's report, Angel Corps determined that Ruth had been dead at the time of Hitchcock's assessment, that Hitchcock performed a deficient assessment on a potential client who had already passed away, and that there was no justification or extenuating circumstances for her actions.  (R. Maples Aff. ¶ 8.)

During her suspension, Hitchcock was given the task of auditing every client file in preparation of the impending state audit.  (Hitchcock Aff. ¶ 32; Hitchcock Dep. 78.)  Just prior to her suspension, Dorian had asked Hitchcock for the ten most recently admitted client files, all of which Hitchcock had performed.  (Hitchcock Aff. ¶ 33.)  On April 29, 2010, Hitchcock had completed her audit of all the client files except these ten and informed Norman that she needed them.  (Hitchcock Aff. ¶ 34.)  When Hitchcock received the files, she found her personal employee file in the middle of them.  (Hitchcock Aff. ¶¶ 34-35.)  Before having her file returned,

---

[6] Norman, on the other hand, maintains that the admission paperwork for Ruth was completed in the home and that she did not specifically instruct Hitchcock to input the information into the computer.  (Norman Dep. 33-34.)  Once again, this dispute does not preclude summary judgment.

she copied it.  (Hitchcock Aff. ¶ 36.)  The next day, she was instructed to put together as many

new admission packets as she could in a day's time.  (Hitchcock Aff. ¶ 38.)

     In the afternoon of the following Monday, May 3, 2010, Hitchcock met with Richard

Maples, Dorian's husband and co-owner of Angel Corps; Norman; and possibly Dorian for a

disciplinary action follow-up meeting.[7]  (Hitchcock Aff. ¶ 39; Hitchcock Dep. 79; Norman Aff. ¶

19; Norman Dep. 37; R. Maples Aff. ¶ 9.)  During this meeting, Richard and Norman terminated

Hitchcock.  (R. Maples Aff. ¶ 9; Hitchcock Aff. ¶ 39; Norman Aff. ¶ 19.)  That same day,

Hitchcock signed a Disciplinary Action Form, filled out by Norman, which gave the reason for

the disciplinary action as "[o]n 4/5/10 this employee completed a full admission on an expired

client."  (Hitchcock Dep. 80, Ex. S.)  Hitchcock understood that this—completing a full

admission on a client who had already died—was the reason Angel Corps was giving for firing

her.  (Hitchcock Dep. 80.)

     The form also states, under corrective steps taken, that "Angel Corps and its management

feel that as a result of this employee's actions she compromised the heath and safety of this

client."  (Hitchcock Dep. Ex. S.)  According to Norman, Hitchcock "compromised the health and

safety of this client" because, if Ruth had been living at the time Hitchcock did her assessment,

Hitchcock would have compromised Ms. Rees's health and safety by not conducting a proper

assessment and by not attending to Ms. Rees's obvious problems, such as the dried liquid on her

mouth, and that Hitchcock would have compromised the health and safety of any client by

conducting an assessment in this manner.  (Norman Aff. ¶ 20.)  In defense of her actions,

---

    [7] While Angel Corps contend that only Richard and Norman met with Hitchcock (Norman Aff. ¶ 19; R. Maples Aff. ¶ 9), Hitchcock contends that Dorian was also present (Hitchcock Aff. ¶ 39; Hitchcock Dep. 79).  Such a dispute is immaterial and does not preclude summary judgment.

Hitchcock wrote at the bottom of the Disciplinary Action Form the following:  "As per my written explanation, the admission papers were completed prior to my seeing this client.  My actions following seeing the client I feel were appropriate.  My safety in this home was a concern for me and I do not feel that I should have acted any differently."  (Hitchcock Dep. Ex. S.) Norman contends that this was the first time Hitchcock documented and expressed that she was fearful for her safety on April 5, 2010.  (Norman Aff. ¶ 19.)

Although Angel Corps has a progressive discipline policy, the policy itself states that the progressive discipline process does not need to be followed to discharge an employee at any time and indicates that discharge is warranted for "infractions of a grave nature."  (Hitchcock Dep. Ex. T.)  Moreover, Angel Corps's disciplinary procedures also provide that "any employee actions which compromise the health and safety of the clients will also be cause for immediate termination."  (Hitchcock Dep. Ex. U.)

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted.  *Payne*, 337 F.3d at 770.  A court

must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

The PDA amended Title VII to forbid an employer from discriminating "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Rather than creating rights or remedies, the PDA simply "clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (citing *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008)). The PDA further "made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Id.* (citations and internal quotations omitted). As such, employment discrimination on the basis of pregnancy is treated as discrimination on the basis of gender, and the legal analysis for a pregnancy discrimination claim is the same as it would be under the traditional Title VII methods of proof. *Id.* (citing *Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007)); *Wiseman v. Autozone, Inc.*, 819 F. Supp. 2d 804, 822 (N.D. Ind. 2011) (citation omitted). Accordingly, a plaintiff alleging pregnancy discrimination can proceed under the direct or indirect method of proof. *Serednyj*, 656 F.3d at 547.

The direct method requires the plaintiff to produce enough evidence, either direct or

circumstantial, "that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011); *see Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) ("The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action."). Such "smoking gun" evidence of discriminatory intent is hard to come by. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).

Under the indirect method, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). In order to do so, the plaintiff must offer evidence that "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Id.* (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006)). If the plaintiff successfully establishes a *prima facie* case, a presumption of discrimination is triggered, *id.*, and the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the challenged employment action, *McDonnell Douglas*, 411 U.S. at 802. Once the employer has done so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for discrimination, which in turn permits an inference of unlawful discrimination. *Coleman*, 667 F.3d at 845 (citing *McDonnell Douglas*, 411 U.S. at 804); *see Burks*, 464 F.3d at 751.

## A.  Direct Method

To survive summary judgment on her pregnancy discrimination claim under the direct

method, Hitchcock must prove that "(1) she was pregnant; (2) she suffered an adverse employment action subsequent to her becoming pregnant; and (3) there was a causal link between the adverse action and her pregnancy." *Wiseman*, 819 F. Supp. 2d at 822.  There is no question that the first two requirements are satisfied—Hitchcock was undoubtedly pregnant when she was terminated and her termination is certainly an adverse employment action, *e.g.*, *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

To satisfy the causation element using the direct method, a plaintiff must offer either direct evidence that would prove the discriminatory intent without reliance on inference or presumption—essentially an admission by the decisionmaker that his actions were based on the prohibited animus—or "a convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.  *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733-34 (7th Cir. 2011) (citations omitted); *see Poer v. Astrue*, 606 F.3d 433, 440 (7th Cir. 2010).  The Seventh Circuit has recently stated that this "mosaic" language "articulate[s] the principle that, for a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, '[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [taken an adverse employment action against] the plaintiff because the latter was a member of a protected class.'"  *Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (quoting *Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012)).

As the Seventh Circuit has further recognized, circumstantial evidence typically falls into the following three types:  (1) suspicious timing, ambiguous statements, behavior or comments

15

directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Id.*; *Diaz*, 653 F.3d at 587. The circumstantial evidence presented "must point directly to a discriminatory reason for the employer's action" and be "directly related to the employment decision." *Dass*, 675 F.3d at 1071 (internal quotations and citations omitted).

Of the three types of circumstantial evidence listed above, Hitchcock offers evidence that falls into the first category—suspicious timing, ambiguous statements, behavior or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn—and the third—alleged pretext.

First, as to suspicious timing, Norman knew about Hitchcock's pregnancy at least by March 25, 2010, when she met with Hitchcock and discussed the pregnancy; as such, the adverse employment action—Hitchcock's termination—occurred over five weeks later, on May 3, 2010. But "[t]he mere fact that [Hitchcock] was ultimately terminated after informing Defendant[ ] of her pregnancy does not show suspicious timing." *Hayes v. Elementary Sch. Dist. No. 159*, No. 10 C 7095, 2012 WL 580713, at *5 (N.D. Ill. Feb. 22, 2012); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (reasoning that the mere fact that one event preceded another does not prove the first caused the second and that "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another"); *Karczynski v. Specialty Equip. Mfg., Inc.*, 105 F. Supp. 2d 907, 912 (N.D. Ill. 2000) (noting that the plaintiff must show some type of connection between her alleged firing and her

pregnancy announcement).  And, regardless, "suspicious timing is rarely sufficient to defeat a motion for summary judgment."  *Silverman*, 637 F.3d at 736 (citation omitted).

But Hitchcock does not rely on suspicious timing alone.  She also presents five pieces of circumstantial evidence in addition to suspicious timing: (1) Norman gave Hitchcock additional duties after they met and discussed her pregnancy on March 25, 2010; (2) Norman began to scrutinize Hitchcock's work after this meeting; (3) Norman made somewhat ambiguous statements during this meeting—asking Hitchcock whether she was going to return to work and stating that everyone needed to stay focused on work; (4) Norman was unfriendly to Hitchcock after she found out about Hitchcock's pregnancy; and (5) Norman allegedly had a conversation with another pregnant employee, Johanna Barrera, about considering an abortion.  Ultimately, however, this mosaic is far from convincing and fails to raise a triable issue of causation.

First, the additional duties and heightened scrutiny Hitchcock complains about after the March 25th meeting are not particularly probative.  After all, Hitchcock's job description certainly contemplated such an assignment of duties by Norman, the Client Services Director.  (*See* Hitchcock Dep. Ex. H (listing, as one of the Client Services Supervisor's essential job functions, "[o]ther duties as assigned by Client Services Director").)  And she was certainly aware of what her job description entailed, having read and signed it.  (*See* Hitchcock Dep. Ex. H.)  Moreover, as the Seventh Circuit has recognized, an "employee doesn't get to write [her] own job description.  An employer can set whatever performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or [gender]."  *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989).  Although the bare timing of both the additional duties and purported increased scrutiny could suggest a correlation between

17

Hitchcock's pregnancy and some turbulence in her relationship with Norman, that is not enough, *Wiseman*, 819 F. Supp. 2d at 823; rather, "circumstantial evidence . . . must point *directly to* a discriminatory reason for the *employer's action*," *Dass*, 675 F.3d at 1071 (emphases added).  In this case, the challenged employer action is Hitchcock's *termination*, not her increased workload or any so-called heightened scrutiny.

Moreover, although Norman's remarks in the March 25th meeting—including her statement that she had been reluctant to discuss Hitchcock's pregnancy because everyone needed to stay focused on work and asking Hitchcock whether she was going to return to work after she gave birth—were "perhaps not the most tactful response," they do not "rise to the level of direct evidence of discrimination" because, "[t]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision-making process."  *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997) (citation omitted); *see also Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 602 (7th Cir. 2003) ("For such a statement to be sufficient circumstantial evidence under the direct method, the remark in question must be 'directly related to the employment decision.'" (citation omitted)).  And all of these remarks took place over a month before Norman and Richard Maples decided to terminate Hitchcock—not to mention, after the intervening event of the botched Rees admission—and, as such, are not directly related to *that* employment decision.[8]

Regarding Norman's purported unfriendliness toward Hitchcock after learning of her

---

[8] Hitchcock also maintains that three other women, one who worked for Angel Corps and two who worked for Home Nursing Services, warned her that her job was in jeopardy and indicated that she was probably going to be fired because she was pregnant.  (*See* Hitchcock Dep. 103; Hitchcock Aff. ¶ 27.)  But none of these women were decisionmakers and, as such, their purported comments do not provide circumstantial evidence of pregnancy discrimination.  *See, e.g*, *Dass*, 675 F.3d at 1072 (stating that a remark can raise an inference of discrimination if it was made by the decision maker, around the time of the decision, and in reference to the employment action).

pregnancy, "unfriendly glances and other subtle indicia of distaste generally fall short of establishing discrimination under [the direct] method of proof." *Grisby v. LaHood*, 628 F.3d 354, 358 (7th Cir. 2010) (citations omitted). Such cold behavior does not contribute much, if anything, to the mosaic of discrimination. *Russo v. Midland Paper Co.*, No. 09 C 07739, 2011 WL 5025238, at *5 (N.D. Ill. Oct. 21, 2011); *see also Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (affirming district court's conclusion that a partner's purported distant, cold, and acrimonious behavior toward a staff attorney after discovering she was pregnant was insufficient to avoid summary judgment).

And Norman's conversation with Johanna Barrera, another pregnant Angel Corps employee, in which an abortion was discussed, took place in the early spring of 2009, roughly a year before Hitchcock even became pregnant, and does not establish a causal nexus between *Hitchcock's* pregnancy and subsequent termination. *Cf. Kennedy*, 140 F.3d at 724 (holding that a partner's alleged comment that "if you were my wife, I would not want you working after having children," made to the plaintiff herself, rather than another pregnant employee, did not rise to the level of direct evidence in connection with the firm's decision to terminate her after her pregnancy when the comment was made at least five months before the attorney's termination, was not temporally related to her discharge, and there was no causal nexus between her discharge and the partner's alleged remark). More importantly, Barrera was not terminated during this pregnancy; she had a miscarriage and then became pregnant again in the fall of 2009. While Barrera was terminated during this second pregnancy, her termination occurred after Angel Corps discovered that she lied about why she took a week off of work, claiming to be sick when she was actually in North Carolina interviewing for another job. As such, Norman's

conversation with Barrera also adds nothing to Hitchcock's mosaic of discrimination.

Further insulating Angel Corps's termination of Hitchcock from her allegations of pregnancy discrimination is the lack of evidence that Richard Maples—who, along with Norman, made the decision to terminate Hitchcock—knew anything about Hitchcock's pregnancy.[9]  *See, e.g., Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 n.7 (7th Cir. 2001) (stating that the plaintiff could not establish the first element of her *prima facie* case of pregnancy discrimination because she had not shown that her employer knew that she was pregnant); *Brown v. Sara Lee Corp.*, No. 1:07-cv-1118-DFH-DML, 2009 WL 995755, at *5 (S.D. Ind. Apr. 14, 2009) (granting summary judgment on plaintiff's pregnancy discrimination claim when the decisionmakers were unaware of her pregnancy when they decided to rescind their employment offer).

And, of course, in a business sense, it is hard to get past the gravity of Hitchcock's mistake—admitting for attendant services someone who had been dead for two or three

---

[9] Furthermore, Hitchcock does not advance a "cat's paw" theory of liability to impute Norman's alleged animus toward her to Richard and their decision to fire her, and this Court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel."  *Aguilera v. Fluor Enters., Inc.*, No. 2:10-CV-95-TLS, 2012 WL 3108864, at *17 (N.D. Ind. July 31, 2012) (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011)).  But even if Hitchcock had argued this theory, it would not apply in this case.

The cat's paw metaphor "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action."  *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).  In such a situation, "it is appropriate to impute discriminatory or retaliatory animus to a decisionmaker when the 'party nominally responsible for a decision is, by virtue of [his] role in the company, totally dependent on another employee to supply the information on which to base that decision.'"  *Hicks v. Forest Preserve Dist.*, 677 F.3d 781, 790 (7th Cir. 2012) (quoting *Brewer v. Bd. of Trs.*, 479 F.3d 908, 918 (7th Cir. 2007)).  Here, not only did Norman and Richard decide to fire Hitchcock together, seemingly making the "cat's paw" theory inapplicable, but there is nothing to impute to Richard as Hitchcock has failed to present sufficient evidence that Norman harbored a discriminatory animus toward her due to her pregnancy and fired her because of that animus (and not because she, undisputedly, admitted a dead person for services).

Additionally, under the "cat's paw" standard, "the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased employee."  *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011).  In this case, Richard did not merely rely on Norman's information regarding Ruth Rees's admission; rather an investigation was conducted into the incident (*see* R. Maples Aff. ¶¶ 6-8), thereby breaking any purported chain of causation.

days—undoubtedly a matter of embarrassment to a business that requires accurate documentation. *See Compton v. Lowe's Companies, Inc.*, No. 08-cv-809-JPG, 2011 WL 499359, at *7 (S.D. Ill. Feb. 8, 2011) (noting, in a retaliation case, that, despite suspicious timing between the plaintiff's final grievance and his termination, the egregiousness of the plaintiff's intervening insubordination could not be ignored). The PDA requires the employer to ignore an employee's pregnancy, but it does *not* require an employer to ignore a pregnant employee's mistakes, unless the employer overlooks the comparable mistakes of nonpregnant employees. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994). And, as will be expanded on below, Hitchcock has not even attempted to show such comparator evidence. Regardless, "this court does not sit as a super-personnel department that reexamines an entity's business decisions." *Pagel v. TIN Inc.*, __ F.3d __, 2012 WL 3217623, at *6 (7th Cir. Aug. 9, 2012) (citation omitted).

Hitchcock nevertheless argues that Angel Corps's stated reason for firing her is pretextual. (*See* Pl.'s Answer Brief in Opp. to Def.'s Mot. for Summ. J. 6-7.) "Pretext is a lie, specifically a phony reason for some action." *Hobbs v. City of Chicago*, 573 F.3d 454, 461 (7th Cir. 2009) (citation and internal quotation marks omitted). Under the direct method, pretext evidence, standing alone, is insufficient to avoid summary judgment, *Johnson v. Cnty. of Cook*, Nos. 08 C 2139, 08 C 3648, 2012 WL 2905485, at *9 (N.D. Ill. July 16, 2012); rather, "circumstantial evidence under the direct method . . . must allow a jury to infer *more than* pretext; it must itself show that the decisionmaker acted because of the prohibited animus," *Venturelli*, 350 F.3d at 601 (emphasis added).

Here, Hitchcock attempts to shed doubt on Angel Corps's stated reason for terminating

21

her, arguing that Ruth's admission was not "complete" until she entered the data into the computer, which she did at Norman's instruction.[10]  But, despite Hitchcock's allegations that Angel Corps provided shifting reasons for firing her (*see* Pl.'s Answer Br. in Opp. to Def.'s Mot. for Summ. J. 1-2, 6, 8), every reason always involved the Ruth Rees incident as Angel Corps has always pointed to it as the reason for her termination (*see* Hitchcock Dep. Ex. S; Norman Aff. ¶¶ 19-20; R. Maples Aff. ¶¶ 8-9).  Hitchcock's effort to suggest that pretext arises from Angel Corps's termination notice and its contention that she compromised the health and safety of Ms. Rees is a mere quibble over language, and not evidence of a lie.

Hitchcock also sees something sinister in her discovery, a week before her termination, of her personnel file among the files of clients she had recently admitted; specifically, she argues that Angel Corps was looking for more mistakes to bolster its decision to fire her.  (Hitchcock Dep. 118-19; Hitchcock Aff. ¶ 36.)  But, not only are the "subjective beliefs of the plaintiff . . . insufficient to create a genuine issue of material fact," such an allegation amounts to mere speculation, which is insufficient to avoid summary judgment.  *Hanners*, 674 F.3d at 692, 694 (quoting *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989)).  Similarly, Hitchcock's claim that the disciplinary policies used against her were created on April 16, 2010, and specifically tailored to her (*see* Pl.'s Answer Br. in Opp. to Def.'s Mot. for Summ. J. 6-7) is wholly unsupported by any evidence, and as such, is also insufficient to withstand summary

---

[10] Although there is some dispute over when the admission was actually complete—either when the paperwork was done or when the information was entered into the computer—Norman, who filled out the Disciplinary Action Form, which gave the reason for Hitchcock's termination as "[o]n 4/5/10 this employee completed a full admission on an expired client" (Hitchcock Dep. Ex. S), states in her affidavit that on April 5th, "Hitchcock returned to the office at 2:30 after *completing* the admission" (Norman Aff. ¶ 5 (emphasis added)).  When Hitchcock first returned to the office, the admission paperwork would not have been entered into the computer because, according to Hitchcock, Norman instructed her to do so only after she knew Ms. Rees was deceased. (Hitchcock Dep. 81.)  Therefore, both times Norman uses the phrase "complete" an admission, the completion happens once the admissions paperwork is completed and *before* the data is inputted into the computer.

judgment, *see Gabrielle M. v. Park-Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 820 n.1 (7th Cir. 2003) ("The unsupported allegations of counsel cannot provide evidence sufficient to withstand summary judgment.").  Therefore, as none of Hitchcock's unsupported pretextual arguments show that Norman and Richard Maples terminated her because of her pregnancy, which is the "prohibited animus" here, her pretext argument under the direct method is unsuccessful.  *Venturelli*, 350 F.3d at 601; *see Johnson*, 2012 WL 2905485, at *9-10.

In the end, the question is whether Hitchcock has presented sufficient evidence from which a reasonable jury could find that, "if all the facts were identical but she were not pregnant, she would have been treated differently."  *Piraino v. Int'l Orientation Res., Inc.*, 137 F.3d 987, 991 (7th Cir. 1998); *Karczynski*, 105 F. Supp. 2d at 912 (quoting same); *see Schandelmeier-Bartels*, 634 F.3d at 381 (holding that the district judge's jury instruction that "[t]o determine that [plaintiff] was terminated because of her race, you must decide that the Park District would not have terminated [her] had she been non-Caucasian but everything else about [her] had been the same" was appropriate).  Considering all of Hitchcock's circumstantial evidence in the face of her intervening mistake, she has failed to present sufficient evidence to meet this burden under the direct method.

### B.  Indirect Method

Turning to the indirect method, although Hitchcock can readily establish two of the four elements of her *prima facie* case of pregnancy discrimination—that she was a member of a protected class and that she suffered an adverse employment action—the third element—whether Hitchcock was meeting Angel Corps's legitimate expectations—is another story.  *See Coleman*, 667 F.3d at 845.

23

To that end, a little less than a month before her termination, Hitchcock undoubtedly performed an admission on a prospective client who had been dead for two to three days, and Angel Corps consistently pointed to this incident as the reason for her termination. (*See* Hitchcock Dep. Ex. S; Norman Aff. ¶¶ 19-20; R. Maples Aff. ¶¶ 8-9.) Poor performance can certainly be a valid, non-discriminatory basis for terminating an employee. *Pagel*, 2012 WL 3217623, at *6. But, admittedly, there is a factual dispute over what Hitchcock was required to do at that admission—namely, whether a physical assessment was required. (*Compare* Hitchcock Aff. ¶ 6 ("Physical assessments were never performed when doing an admission on a new client.") *with* Norman Aff. ¶ 13 ("Ms. Hitchcock or any other employee of Angel Corps must always perform a basic physical assessment to confirm any information that has been provided by a third party.").) This factual dispute, however, does not preclude summary judgment as Hitchcock has wholly failed to establish the fourth element of her *prima facie* case of pregnancy discrimination—that a similarly situated individual not in the protected class was treated more favorably than her. *See Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007) ("Despite the existence of a genuine issue of material fact on one element of [Plaintiff's] claim, summary judgment is still appropriate if [Plaintiff] cannot provide evidence to support all elements of the claim." (citations omitted)).

Seemingly recognizing this failure, Hitchcock argues that "[t]here has to be some flexibility with respect to the fourth element." (Pl.'s Answer Br. in Opp. to Def.'s Mot. for Summ. J. 8.) But, as the Seventh Circuit has recently reiterated, while the "similarly-situated" inquiry is a "flexible, common-sense one," "it at least requires that the plaintiff name a comparator outside her protected class." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698,

703 (7th Cir. 2012) (citation and internal quotations omitted).  Hitchcock, however, has not even

attempted to identify an employee outside of her protected class—i.e., non-pregnant—that was

treated better than her.  *See id.*

Additionally, "[t]o meet her burden of demonstrating that another employee is 'similarly

situated,' a plaintiff must show that there is someone who is directly comparable to her in all

material respects."  *Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009) (citing *Patterson v.*

*Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)).  "[W]hen a plaintiff alleges that he

received harsher discipline than other employees, it is necessary for the court to consider

whether the employees engaged in the same conduct for which the plaintiff was disciplined."

*Hanners*, 674 F.3d at 693; *see also Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir.

2011) (stating that, in discriminatory discipline claims, "courts compare the similarity of

misconduct, performance standards, qualifications, and disciplining supervisor").  In Hitchcock's

case, she has not pointed to any Angel Corps employee who engaged in misconduct remotely

similar to hers.

Therefore, as Hitchcock has not shown that similarly-situated employees outside of her

protected class were treated more favorably than her, she has failed to establish a *prima facie*

case of pregnancy discrimination, making summary judgment in favor of Angel Corps

appropriate.  *See, e.g.*, *Arizanovska*, 682 F.3d at 703; *Diaz*, 563 F.3d at 590 ("Absent a valid

comparator, Robles cannot move past summary judgment under the indirect method of proof.");

*Luster*, 652 F.3d at 732.

And even if Hitchcock *had* pointed to a similarly situated, non-pregnant comparator, her

pregnancy discrimination claim would still fail because of her inability to cast doubt on Angel

Corps's nondiscriminatory reason for terminating her.  *Naficy v. Ill. Dep't of Human Servs.*, __ F.3d __, 2012 WL 4070115, at *6 (7th Cir. Sept. 18, 2012).  To demonstrate pretext, Hitchcock must show (1) that Angel Corps's "nondiscriminatory reason was dishonest"; and (2) that Angel Corps's "true reason was based on a discriminatory intent"—in this case, her pregnancy. *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010) (quoting *Fisher v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008)); *Hobbs*, 573 F.3d at 461; *see also Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 337-38 (7th Cir. 2012) (noting that an employer's reason for taking an adverse action must be based on discriminatory intent).

A plaintiff that uses indirect evidence to meet this burden must show that the employer's reason is not credible or factually baseless and must also provide evidence that supports the inference that the real reason was discriminatory.  *Stockwell*, 597 F.3d at 901-02 (citing *Fischer*, 519 F.3d at 403).  But, at the same time, because courts are not super-personnel departments charged with determining best business practices, "even if the business decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason."  *Id.* at 902 (citations omitted).

Here, Hitchcock has first failed to meet her burden of showing that Angel Corps's stated reason for terminating her—that she "completed a full admission on an expired client" (Hitchcock Dep. Ex. S)—was not credible or factually baseless.  As explained above, Hitchcock's pretextual arguments all amount to mere speculation or unsupported allegations.  Furthermore, despite Hitchcock taking issue with the language Angel Corps used in its disciplinary forms, Angel Corps has consistently pointed to Hitchcock's actions during the Rees admission as its reason for terminating her.  (*See* Hitchcock Dep. Ex. S; Norman Aff. ¶¶ 19-20;

26

R. Maples Aff. ¶¶ 8-9.)  And even if Angel Corps reacted unreasonably or too harshly to Hitchcock's botched admission of Ruth—by, for instance, not considering Hitchcock's alleged, but lightly expressed fear—the evidence points to Angel Corps honestly believing the reason for the termination, and it is not this Court's role to judge such a business decision.  *Stockwell*, 597 F.3d at 902; *see also Magnus*, 688 F.3d at 338 (noting that what matters is whether the employer "honestly believed that [the plaintiff's] performance was deficient" and not whether that evaluation was wrong).  Moreover, not only has Hitchcock failed to demonstrate that Angel Corps's reason for terminating her was not credible or factually baseless, but she has also completely failed to show that the real reason for her termination was her pregnancy, both of which are required to establish pretext.  *E.g.*, *Stockwell*, 597 F.3d at 901.  As such, because Hitchcock has not established the elements of her *prima facie* case, let alone pretext for her termination, she cannot survive summary judgment under the indirect method either.

Ultimately, Hitchcock has not shown "that if all the pertinent facts were as they are except for the fact of her pregnancy she would not have been fired.  So in the end she has no evidence from which a rational trier of fact could infer that she was a victim of pregnancy discrimination."  *Troupe*, 20 F.3d at 738.  Accordingly, Angel Corps is entitled to summary judgment on Hitchcock's pregnancy discrimination claim.

## V.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Docket # 17) and DIRECTS the Clerk to enter judgment in favor of Defendant Angel

Corps, Inc., and against Plaintiff Jennifer Hitchcock.

SO ORDERED.

Entered this 2nd day of October, 2012.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge